1

2

3

4

5 **IN THE UNITED STATES DISTRICT COURT FOR THE**

6 **EASTERN DISTRICT OF CALIFORNIA**

7

8

9 **MANUELA CANCINO CONTRERAS** ) **1:10-cv-1203 AWI JLT**
**MORALES; R.A.M.,** )

10  ) **PRETRIAL ORDER**
   **Plaintiffs**, )

11  ) **Motions In Limine Hearing:**
 **v.** )   **October 15, 2012**

12  )   **1:30 p.m., Courtroom 2**
**CITY OF DELANO; MARK P.** )

13 **DEROSIA; JOSE MEJIA; SHAUN** ) **Trial: October 30, 2012**
**MANUELE; and DOES 1 through 50,** )   **8:30 a.m., Courtroom 2**

14 **inclusive,** )
 ) **RULES OF CONDUCT**

15    **Defendants** )
_____)

16

17

18    The pretrial conference was held on September 6, 2012.   The trial in this matter is

19 set for October 30, 2012.  The parties currently estimate that the trial shall take five to seven

20 days.

21         **I.  Jurisdiction and Venue**

22    Federal jurisdiction is conferred upon this Court pursuant to Title 28, United States Code

23 §§ 1331 and 1343, and arises under Title 42, United States Code §§ 1983 and 1988. The state

24 law claims for relief are within the supplemental jurisdiction of this Court pursuant to 28 U.S.C.

25 § 1367.  Venue is appropriate as the claim arose within this District, under 28 U.S.C. § 1391(b).

26 The parties admit that jurisdiction and venue are proper.

27         **II.  Jury Trial**

28    All parties have requested a jury trial, which is currently scheduled to commence on

October 30, 2012.  The trial is estimated to take five (5) to seven (7) days.

### III.  Facts

#### A.  Undisputed Facts

1.  The City of Delano is a municipality which operates a police department.

2.  The incident at issue in this matter took place on July 7, 2009, at 1118 Oxford Place, Delano, California.

3.  At the time of the incident, Ruben Mesa Morales was paying a rent of $500.00 per month to Maria and Gabriel Nunez.

4.  At the time of the incident, Mark DeRosia (hereinafter "Defendant DeRosia" or "DeRosia") was the Chief of Police of the City of Delano Police Department.

5.  At the time of the incident, Defendant Manuele was a sworn police officer with the City of Delano Police Department.

6.  In or around April 2009, Ruben Mesa Morales met plaintiff R.A.M. for the first time when plaintiff R.A.M came to Delano, California.

7.  With the exception of the April 2009 visit, plaintiff R.A.M and Ruben Mesa Morales never spent any time together.

8.  With the exception of his birth in Georgia, plaintiff R.A.M has continuously lived in Zacatecas, Mexico.

9.  Defendants Manuele and Mejia never spoke to the reporting party, Maria Nunez, on July 7, 2009, at 1118 Oxford Place, Delano, California.

10.  Defendant Manuele did not fire a single round from his pistol at the scene of the incident.

11.  No other City of Delano Police Department officers fired their pistols at the scene of the incident.

#### B.  Disputed Facts

The Plaintiffs present the following facts in support of their case, which the Defendants dispute.  It must be pointed out that this list is neither exhaustive of the facts the Plaintiffs may

present in support of their case nor, conversely, the list is not exhaustive of the facts that may be presented by the Defendants in response to Plaintiffs' allegations.

1.      At the time of the incident, Defendant Mejia was a Level II reserve police officer with the City of Delano Police Department.

2.      At the time of the incident, Ruben Mesa Morales was a retired, decorated U.S. army veteran with over 20 years of military service.

3.      At the time of the incident, Ruben Mesa Morales was a healthy 50 year-old man with a high school education.

4.      On February 14, 2000, Ruben Mesa Morales married Manuela Cancino Contreras in Zacatecas, Mexico.

5.      At the time of the incident, plaintiff Manuela Cancino Contreras Morales was 29 years of age.

6.      Ruben Mesa Morales lived in North Carolina at the time that he met Plaintiff Manuela Cancino Contreras, and several years after he married her, moved to Bakersfield, and then he finally moved to Delano, California.

7.      After marrying plaintiff Manuela Cancino Contreras Morales, Ruben Mesa Morales took a lucrative job working in Qatar and sent money to plaintiff Manuela Cancino Contreras Morales, who resided in Zacatecas, Mexico, to support her.

8.      On November 6, 2002, R.A.M. was born to the parents of Ruben Mesa Morales and Manuela Cancino Contreras Morales in Georgia, United States.

9.      Ruben Mesa Morales was not present during the birth of his son, R.A.M, as he was working in Qatar at the time.

10.     Plaintiff Mrs. Manuela Cancino Contreras Morales is a school teacher in Mexico and is pursuing her Master's degree and Ph.D. in teaching in Mexico.

11.     After Ruben Mesa Morales' employment contract ended in Qatar, he looked for work in Mexico and United States, and he eventually found employment in Delano, California.

12. Because of their jobs, plaintiff Mrs. Manuela Cancino Contreras Morales and her husband, Ruben Mesa Morales, elected to live apart. However, living separately was not the long-term plan for the Morales family, as they intended to build a family home in Zacatecas, Mexico.

13. To achieve the goal of building their home, Mr. Ruben Mesa Morales was working and saving money at a job in Delano, California.

14. From the time Ruben Mesa Morales met Plaintiff Manuela Cancino Contreras, she has continuously lived in Zacatecas, Mexico and they never lived together.

15. At the time of Mr. Ruben Mesa Morales' death, a home was being built for the Morales family to live in located in Zacatecas, Mexico.

16. Prior to Mr. Ruben Mesa Morales' death, whenever plaintiff Manuela Cancino Contreras Morales's teaching schedule would permit, she would visit Mr. Morales for a month or so at a time in Delano.

17. Plaintiff Mrs. Manuela Cancino Contreras Morales would not bring young R.A.M. to Delano to visit with his father, as she had concerns about bringing R.A.M. back and forth across the Mexican border, given that she was of Mexican citizenship, and R.A.M. was of American citizenship.

18. During her last visit to see decedent Mr. Ruben Mesa Morales in Delano, which took place in April 2009, just three months before his death, plaintiff Manuela Cancino Contreras Morales brought young R.A.M. along.

19. This visit in April 2009 was the last time Plaintiffs saw their husband and father before he was killed by defendant Mejia.

20. For the three weeks in April, plaintiff R.A.M. was able to spend time with his father, which he had not been able to do before then, and will not ever be able to do again.

21. During that visit in April 2009, prior to his death, decedent Ruben Mesa Morales and his son R.A.M. played soccer together and they were able to be a family.

4

22.     From the time Ruben Mesa Morales met Manuela Cancino Contreras, she has continuously lived in Zacatecas, Mexico.

23.     Ruben Mesa Morales never resided in Zacatecas, Mexico.

24.     As of January 1, 2009, Maria and Gabriel Nunez owned real property located at 1118 Oxford Place, Delano, California.

25.     Maria and Gabriel Nunez have three minor children: G. Jr. N., C.N. and B.N.

26.     The real property located at 1118 Oxford Place, Delano, California, consisted of a main house and a converted garage that they rented out as an apartment.

27.     At the time of his death, Ruben Mesa Morales had paid rent of $500/month to the Nunez family for the apartment located at 1118 Oxford Place, Delano, California and he had been doing so for about four months.

28.     The apartment occupied approximately one-third of the Nunez' property and had a living-room/kitchen area, a bathroom and a bedroom, and the apartment had its own entry doors.

29.     The living-room/kitchen area of the apartment was in the back of the apartment.

30.     In the corner of the living-room/kitchen area was a "small hallway opening" which led into a "very small" bathroom.

31.     On the other side of the bathroom in the apartment was the bedroom that was at the front of the apartment.

32.     From the bedroom of the apartment there was a door that led out to the street.

33.     Mrs. Nunez did not have a key to Mr. Ruben Mesa Morales' apartment and she did not enter the apartment when it was rented to him.

34.     At the time of his death, Mr. Ruben Mesa Morales worked at Paramount Citrus in Delano, California.

35.     On a daily basis, Mr. Ruben Mesa Morales drove his van to and from work.

36.     Mr. Morales would park his van on the street outside the fence in front of the Nunez' home and it was so parked on July 7, 2009.

37. On July 7, 2009, Mrs. Maria Nunez had returned home shortly after midnight, with her three children, and saw that the front door to her residence was open and lights were flickering inside her home.

38. On July 7, 2009, shortly after midnight, Mrs. Nunez became frightened when she saw the front door to her residence open and lights flickering inside her home and she called her husband, who was working.

39. On July 7, 2009, shortly after midnight, Mr. Nunez told his wife, Mrs. Nunez, to call 911, which she did.

40. On July 7, 2009, shortly after midnight, Mrs. Nunez called 911 to report that her front door was open, there were lights flickering on the inside of her residence.

41. On July 7, 2009, shortly after midnight, a 911 operator advised Mrs. Nunez that the police would be responding to her home.

42. On July 7, 2009, shortly after midnight, while Mrs. Nunez was waiting for the police to arrive, Mrs. Nunez knocked on the door and window to Mr. Ruben Mesa Morales' apartment to roust him, but she did not get a response.

43. On or about July 7, 2009, shortly after midnight, City of Delano Police Department dispatched police officers to 1118 Oxford Place, Delano, California in response to Mrs. Nunez' telephone call.

44. On or about July 7, 2009, shortly after midnight, City of Delano Police Department officers Alberto Felix ("Officer Felix"), Michael Adams ("Officer Adams"), Steven Glenn ("Officer Glenn"), Defendant Manuele and Defendant Mejia responded to the dispatcher's call to proceed to 1118 Oxford Place, Delano, California.

45. After arriving at  1118 Oxford Place, Delano, California, Defendant Manuele and Defendant Mejia were sent by Officer Felix to cover the back of the Nunez' property.

46. Defendant Mejia had been employed as a reserve officer with the City of Delano Police Department less than six months at the time he shot and killed Mr. Ruben Mesa Morales.

47.     Officers Felix, Adams, Glenn were to search the house accessible through the front door and determine if there were intruders.

48.     On or about July 7, 2009, shortly after midnight, after arriving on the scene of the incident, Officer Felix spoke to Mrs. Nunez.

49.     Officer Felix is not paid by the Delano police department to speak Spanish.

50.     While Mrs. Maria Nunez was standing on the sidewalk in front of the Nunez' residence, she told Officer Felix that she rented a portion of her home to a person and that she had knocked on the apartment window before Officer Felix entered the Nunez' residence but she did not get a response.

51.     Also, present during Mrs. Nunez' conversation with Officer Felix was Officer Glenn.

52.     Officer Felix acknowledged that Mrs. Nunez had told him that she had a renter and that she had knocked on the door to the renter's apartment.

53.     Officer Felix testified that based upon Officer Glenn's knowledge of Spanish that he understood what Mrs. Nunez had said as well to him about her renter.

54.     On July 7, 2009, shortly after midnight, a female resident of 1118 Oxford Place, Delano, California, called 911 to report that her front door was open, there were lights flickering on the inside of her residence, and that no one was supposed to be inside her residence.

55.     On or about July 7, 2009, shortly after midnight, City of Delano Police Department Officers Alberto Felix (hereinafter "Officer Felix"), Michael Adams (hereinafter "Officer Adams"), Steven Glenn (hereinafter "Officer Glenn"), Defendant Manuele and Defendant Mejia were dispatched and responded to the call for service at 1118 Oxford Place in Delano, California.

56.     The dispatched officers were advised of a possible 459 (burglary) and dispatch relayed to them the information provided by the reporting party:  that she had just arrived home to find her front door open with a light flickering on the inside and that no one was supposed to

7

1  be inside the residence.

2       57.    The reporting party never advised dispatch that she had a tenant or rented out a

3  portion of her residence to any person.

4       58.    Upon arriving at 1118 Oxford Place, Delano, California, Defendants Manuele and

5  Mejia proceeded directly to the back of the residence.

6       59.    Mrs. Nunez testified that after she had told Officer Felix about having a renter,

7  she saw Officer Felix then talking on his radio, presumably communicating this fact to the other

8  officers on the scene.

9       60.    Later during the day of the shooting, after Mr. Ruben Mesa Morales had died,

10  Mrs. Nunez called the Delano Regional Medical Center to check on the status of Ruben Mesa

11  Morales and was connected with Chevy Garza, a Kern County D.A. investigator, whom she told

12  that she had told the City of Delano police officers that she had a renter.

13       61.    The Kern County D.A.'s investigator, Chevy Garza, reported that when he spoke

14  with Mrs. Nunez the night of the shooting, she told him that she had told the officers at the scene

15  prior to the shooting that "she had a renter and he might be out there."

16       62.    After the shooting, Mrs. Maria Nunez told Kern County D.A. investigator Chevy

17  Garza that she ran out of the house and asked an officer if they had shot her renter, and the officer

18  told her "I think so."  Mrs. Maria Nunez also reported to Investigator Garza that she told the

19  officer "I told you he was back there."

20       63.    Despite being advised of a renter in the apartment on the Nunez' property on the

21  night of the shooting, Officer Felix stated he did not broadcast this information to the other City

22  of Delano Police officers on the scene.

23       64.    The City of Delano claims to have no recordings of the radio transmissions as to

24  the incident for the night of the incident.

25       65.    Not one of the City of Delano Police officers on the scene of the shooting went

26  and knocked on the apartment windows on the night of the incident.

27

28

66.     There was no search warrant issued to the City of Delano Police Department or any of its officers to search 1118 Oxford Place, Delano, California on July 7, 2009 or July 8, 2009.

67.     Before he entered the residence at 1118 Oxford Place, Delano, California, Officer Felix advised dispatch, and the other officers on scene, he was clearing the radio channel for emergency communication before he entered the residence and began a search.

68.     Officers Felix, Adams and Glenn searched the house at 1118 Oxford Place, Delano, California, accessible through the front door and determined there was no intruder.

69.     After Officers Felix, Adams and Glenn entered the house through the front door and conducted a search, and determined there was no intruder, Officer Felix called into Dispatch with a "Code 4," and called a "Code 30."

70.     According to the Delano Police Department Patrol Commander Raul Alvizo, a high ranking officer in the department, "Code 4," means "everything is okay."

71.     After the Code "4" was issued by Officer Felix, Officer Adams left the Nunez' house because everything was okay, and headed for his patrol car.

72.     After clearing the house, Officer Felix brought Mrs. Nunez back into the house.

73.     Upon arriving at 1118 Oxford Place, Defendants Mejia and Manuele directly entered the back yard portion of the residence.

74.     Between the time Defendants Mejia and Manuele entered the backyard and the moment Defendant Mejia fired one shot from his pistol, neither Defendant Manuele nor Defendant Mejia received any additional information, from another officer or civilian, other than that information they received from dispatch prior to their arrival.

75.     At the time Defendant Mejia fired his pistol, neither he nor Defendant Manuele had any information that any person with a legitimate right to be on the property may be present inside the residence.

76.     On the night of the incident, Defendant Mejia was not carrying a baton as he had

9

left it in the police car.

77.   On the night of the incident, Defendant Mejia was not carrying a taser as he did not have a taser.

78.   On the night of the incident, Defendant Mejia was carrying OC pepper spray but did not consider using OC pepper spray on Ruben Mesa Morales.

79.   Despite the Nunez' residence being cleared, Defendant Manuele and Defendant Mejia proceeded to enter Mr. Ruben Mesa Morales' apartment through a closed door, without even knocking.

80.   Defendant Manuele testified that the only thing that happened from the time that he and Defendant Mejia entered Mr. Morales' apartment, defendant Manuele did not hear any noise or see anything from Mr. Ruben Mesa Morales' apartment that caused him to believe that someone was in Mr. Morales' apartment.

81.   Defendant Manuele testified that the only thing that happened from the time he took up his position in the back yard until the time he entered Mr. Ruben Mesa Morales' apartment was that Officer Felix had said "Code 4" and cleared the channel which meant, "they had searched the residence and it was clear."

82.   Defendant Mejia testified that Code 4 meant "everything's secure at this point."

83.   Defendant Manuele further testified that prior to the time that he and Defendant Mejia entered Mr. Ruben Mesa Morales' apartment, they were not in pursuit of a burglary suspect, nor was there pending (or ever) any criminal investigation of Mr. Morales.

84.   Defendant Manuele also testified that prior to the time that he and Defendant Mejia entered Mr. Ruben Mesa Morales' apartment; he received no other information from any other officer that caused him to believe that someone was in Mr. Morales' apartment.

85.   Defendant Manuele had called "Code 4" into dispatch just eleven seconds before Defendant Mejia fatally shot Mr. Ruben Mesa Morales.

86.   Defendant Manuele testified that at no time did Defendant Mejia tell Mr. Ruben

Mesa Morales that he was under arrest.

87.    Defendant Manuele testified that when he saw Mr. Ruben Mesa Morales, he was wearing only boxer shorts -- and Ruben Mesa Morales was unarmed.

88.    Defendant Manuele pointed his service weapon at decedent Ruben Mesa Morales.

89.    Defendant Mejia was standing right beside Defendant Manuele at the time Defendant Mejia shot Ruben Mesa Morales.

90.    Defendant Manuele was an "integral participant" in defendant Mejia's excessive use of force.

91.    Defendant Manuele admitted that at the time Defendant Mejia shot Ruben Mesa Morales, Defendant Manuele had been transitioning from his gun to a taser, based upon his assessment of the situation.

92.    Defendant Manuele admitted that at the time Defendant Mejia shot Ruben Mesa Morales, Officer Manuele had de-escalated the threat posed by Ruben Mesa Morales because Ruben Mesa Morales was unarmed.

93.    Defendant Manuele admitted that no warning was provided to Ruben Mesa Morales that Defendant Mejia was about to shoot him.

94.    Defendant Manuele admitted that he was "surprised" that Defendant Mejia had fired his weapon at Ruben Mesa Morales.

95.    Ruben Mesa Morales did not die immediately from the gunshot wound inflicted by Defendant Mejia.

96.    After Defendant Mejia shot Mr. Ruben Mesa Morales, no officers rendered any first aid to Mr. Ruben Mesa Morales for a significant amount of time.

97.    As Mr. Ruben Mesa Morales was being transported to an emergency vehicle, Mrs. Nunez saw him, and heard him making sounds as if he was "drowning," and Mr. Ruben Mesa Morales thereafter died as a result of the gunshot from Defendant Mejia.

98.    Ruben Morales was transported to the hospital, where he later died.

99.     No weapons were found in Mr. Ruben Mesa Morales' possession or in his apartment.

100.    The Dispatch Log had a "late entry" five hours after the shooting incident that had been made regarding Mrs. Nunez allegedly telling the dispatcher that no one was supposed to be inside.

101.    Prior to his employment with the City of Delano Police Department, Defendant Mejia had previously sought employment with the CHP but failed the CHP written test.

102.    Between the time of the conclusion of Defendant Mejia's academy training on January 19, 2006, and his employment at the City of Delano Police Department in 2009, he never possessed a firearm, nor did have any training with a firearm.

103.    After Defendant Mejia began his employment with the City of Delano Police Department, he spent "10 or 15 minutes" qualifying to carry a firearm.

104.    Despite having access to a gun range where Defendant Mejia could go and practice shooting, to become proficient with a gun, he never did so.

105.    Between the time of the conclusion of Defendant Mejia's academy training on January 19, 2006, and his employment at the City of Delano Police Department in 2009, he never had any self-defense training.

106.    Between the time of the commencement of Defendant Mejia's employment at the City of Delano Police Department in 2009 and his fatal shooting of Ruben Mesa Morales, Defendant Mejia did not have any self-defense training.

107.    Defendant Mejia, a Level II reserve officer, had not received critical POST training, including shoot-don't shoot training reinforced by role play and simulation required in the POST basic curriculum.

108.    Defendant Mejia was deployed by the defendant City of Delano into situations without any testing to make sure he could competently be part of an officers' response to a possible residential burglary in progress.

12

109.    Defendant City of Delano Police Department officials' Internal Affairs investigation of the shooting at issue suffered glaring and obvious problems such that the outcome is reflective of a custom and practice within the Delano Police Department to look the other way rather than hold to their written and publically expressed policies and procedures.

110.    As part of the Internal Affairs investigation into the shooting death of Mr. Ruben Mesa Morales, Officer Flores, the officer conducting the investigation, did not even interview Defendant Mejia or Defendant Manuele.

111.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not know Defendant Manuele had called "Code 4" into dispatch just eleven seconds before the shooting.

112.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not obtain or review the Dispatch Log, which would have demonstrated Manuele had called Code 4, yet, eleven seconds later Defendant Mejia shot Mr. Ruben Mesa Morales.

113.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not review the Dispatch Log, so he did not question the "late entry" that had been made regarding Mrs. Nunez allegedly telling the dispatcher that no one was supposed to be inside

114.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not know it was the City of Delano police department's gun that was involved in the shooting.

115.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not even attempt to review radio transmissions from that incident, and therefore did not even know that there were none.

116.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not know Defendant Mejia

13

did not have his baton at the time he fatally shot Ruben Mesa Morales.

117.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not know Defendant Mejia did not have his Taser at the time he fatally shot Ruben Mesa Morales.

118.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not know Defendant Mejia did not consider using his OC pepper spray at the time he fatally shot Ruben Mesa Morales.

119.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not know that at the time Defendant Mejia fatally shot Ruben Mesa Morales, he had not touched a handgun since his graduation from the academy except for 10-15 minutes to qualify.

120.    As part of the Internal Affairs investigation into the shooting death of Mr. Morales, Officer Flores, the officer conducting the investigation, did not visit or examine the scene of the shooting.

121.    As part of it investigation into the shooting death of Mr. Morales, the Shooting Review Board did not interview anyone, including officers on the scene or any percipient witnesses.

122.    As part of it investigation into the shooting death of Mr. Morales, the Shooting Review Board did not know Defendant Manuele had called "Code 4" into dispatch just eleven seconds before the shooting.

123.    As part of it investigation into the shooting death of Mr. Morales, the Shooting Review Board did not know Defendant Manuele had transitioned from his gun to his Taser as he had de-escalated the threat posed by the unarmed Ruben Mesa Morales at the time Defendant Mejia fatally shot Ruben Mesa Morales.

124.    As part of it investigation into the shooting death of Mr. Morales, the Shooting Review Board did not obtain or review the Dispatch Log, which would have demonstrated

1   Defendant Manuele had called Code 4, yet, eleven seconds later Defendant Mejia shot Mr.

2   Ruben Mesa Morales.

3       125.    As part of it investigation into the shooting death of Mr. Morales, the Shooting

4   Review Board did not review the Dispatch Log, so they did not question the "late entry" that had

5   been made regarding Mrs. Nunez allegedly telling the dispatcher that no one was supposed to be

6   inside.

7       126.    As part of it investigation into the shooting death of Mr. Morales, the Shooting

8   Review Board did not even attempt to review radio transmissions from that incident, and

9   therefore did not even know that there were none.

10      127.    As part of it investigation into the shooting death of Mr. Morales, the Shooting

11  Review Board did not know Defendant Mejia did not have his baton at the time he fatally shot

12  Ruben Mesa Morales.

13      128.    As part of it investigation into the shooting death of Mr. Morales, the Shooting

14  Review Board did not know Defendant Mejia did not have his Taser at the time he fatally shot

15  Ruben Mesa Morales.

16      129.    As part of it investigation into the shooting death of Mr. Morales, the Shooting

17  Review Board did not know Defendant Mejia did not consider using his OC pepper spray at the

18  time he fatally shot Ruben Mesa Morales.

19      130.    As part of it investigation into the shooting death of Mr. Morales, the Shooting

20  Review Board did not know Defendant Mejia had not touched a handgun since his graduation

21  from the academy except for 10-15 minutes to qualify.

22      131.    As part of it investigation into the shooting death of Mr. Morales, the Shooting

23  Review Board did not visit or examine the scene of the shooting.

24      132.    In just the three years prior to the shooting of Ruben Mesa Morales by Defendant

25  Mejia, while defendant Mark DeRosia was the Chief of Police of the City of Delano Police

26  Department, there have been three officer-involved shootings and possible constitutional

27

28                                        15

violations.

133.    In each of the three officer-involved shootings, defendant DeRosia determined that the use of force was justified as it was within department policy limits and no discipline or training was needed.

134.    Defendant DeRosia's failure to discipline or require additional training of his officers following deadly-force shootings supported a culture of excessive force by his officers on citizens in the community.

135.    Plaintiffs' harms and losses include economic damages due to the loss of the decedent Ruben Mesa Morales' economic contribution (past and future) as well as burial and funeral expenses total approximately $588,706.

136.    Plaintiffs have also suffered a significant loss of care, comfort and society of Ruben Mesa Morales in a sum totaling no less than $2,500,000.

137.    The individual defendants' conduct in maliciously and unlawfully entering Ruben Mesa Morales' apartment and subsequently killing Ruben Mesa Morales exposes them to punitive damages in an amount not less than $1,500,000.

138.    Plaintiffs, as the prevailing party in this action, would also be entitled to an award of attorneys' fees pursuant to 42 U.S.C. Section 1988 in an amount not less than $650,000.

**C.  Disputed Factual Issues**

1.    Whether Officer Manuele and reserve officer Mejia were authorized to conduct warrantless search of Mr. Ruben Mesa Morales' apartment.

2.    Whether Reserve Officer Mejia used excessive force in fatally shooting Mr. Morales.

3.    Whether Officer Manuele used excessive force in pointing his loaded service weapon at Mr. Morales.

4.    Whether Officer Mejia was inadequately trained with regard to the use of lethal force because of: (1) the decision of Mejia and Manuele to enter the apartment, and (2) the

position of Mejia as the lead officer or his positioning so as to be the first to confront the decedent.  Defendants contend that the sole issue is whether the City of Delano had a policy or custom to fail to properly train Defendant Mejia with regard to the use of lethal force, which is the only remaining viable theory of recovery brought pursuant to *Monell*.

5       Whether the City of Delano had a policy or custom of approving and ratifying the use of deadly force by its police officers in deprivation of constitutional rights.  The Defendants contend that the only theory of recovery remaining brought pursuant to *Monell* concerns the adequacy of Officer Mejia's training as described above in #4.  Defendants assert that the only other theory of recovery Plaintiffs allege in their SAC concerned the insufficiency of internal affairs investigations of previous officer involved shootings, which the Court dismissed on summary judgment.

6.       Whether Plaintiffs' constitutional rights were violated pursuant to the 14th Amendment and the 4th Amendment.  Defendants contend that the Plaintiffs may only assert a claim individually for the 14th Amendment.

7.       Whether Plaintiffs suffered harms and losses.

8.       Whether any action taken by defendant Officer Manuele was malicious, oppressive and in reckless disregard of Mr. Morales' life. Defendants contend that the factual dispute is simply whether Officer Manuele is liable for wrongful death of the decedent for committing a battery upon his person.  However, the SAC does not allege that Officer Manuele ever battered the decedent.

9.       Whether any action taken by defendant reserve Officer Mejia was malicious, oppressive and in reckless disregard of Mr. Morales' life.  Defendants contend that the factual dispute is simply whether Officer Mejia is liable for wrongful death of the decedent for committing a battery upon his person.

10.       Whether Defendant Mejia and Defendant Manuele are entitled to qualified

17

immunity.

11.     Whether Plaintiff Manuela Cancino Contreras Morales has standing to bring this action.

### IV.  Evidence – Evidentiary Issues

On August 17, 2012, the parties met and conferred regarding their respective motions in limine in attempt to resolve them.  However, the parties were not able to reach a resolution on any of the proposed motions in limine.

### A.  Plaintiff's Evidentiary Issues

Presently plaintiffs will seek the following motions in limine, but reserve the right to file other motions in limine prior to, and during, trial:

1.     Exclusion of any testimonial evidence from Defendants' late-disclosed witnesses -- Stella Morales, Ruben Jesus Morales, Manuela Holguin Contreras Morales, Edgar Morales, Mario Morales, and Jennifer Morales. The fact that such witnesses were not disclosed until long after the discovery cut-off date is certainly harmful.  Plaintiffs will be extremely prejudiced if defendants are allowed to call these witnesses to testify at trial, as plaintiffs were not afforded the opportunity to depose the witnesses in preparation for trial.  Plaintiffs submit that if Defendants had intended to call these witnesses at trial, they should have been previously identified, and Defendants' failure to do so precludes Defendants from calling them to testify and also that other appropriate sanctions be imposed against them.

2.      Exclusion of any evidence from any source regarding decedent Ruben Mesa Morales' alleged violent character as such evidence is irrelevant, improper character evidence and much more prejudicial than probative.

3.     Exclusion of any documentary evidence from any source disclosed until long after the discovery cut-off date.

4.     Exclusion of any testimonial or documentary evidence that decedent Ruben Mesa

18

Morales had alcohol in his system at the time he was fatally shot by reserve officer Mejia.

5.      Exclusion of any evidence that decedent Ruben Mesa Morales was previously married as such evidence is irrelevant, improper character evidence and much more prejudicial than probative.

6.      Exclusion of any evidence of plaintiffs' motive in initiating this lawsuit.

7.      Limitation of defendants' experts to the opinions and documents set forth in their rule 26 reports.

8.      Exclusion of defendants' expert Darryl Zengler as he was previously was previously interviewed by plaintiffs' counsel and provided confidential information regarding this matter.

9.      Exclusion of any irrelevant evidence, especially unfounded, false criticisms regarding plaintiffs' expert, Roger Clark.

10.     Exclusion of any unfounded, speculative, irrelevant evidence and opinions of defendants' expert, John Callanan, Jr.

11.     Exclusion of any evidence regarding the nationality of plaintiff Manuela Cancino Contreras Morales.

**B.  Defendants' Evidentiary Issues**

By motions in limine, Defendants may seek the following; however, such list may not be exhaustive and the Defendants reserve the right to file additional motions in limine if such were later deemed necessary:

1.      Exclusion and/or limitation of testimony of Roger Clark.

2.      Exclusion of any evidence of the incident not known to Defendants Mejia and Manuele at the time Defendant Mejia fired his pistol pursuant to Graham v. Connor and the subsequent line of cases.

3.      Exclude irrelevant investigations including the reports, statements, video

recordings, and audio recordings in relation to the incident.

    4.    Exclude certain plaintiffs' witnesses from testifying.  For example, Plaintiffs' witnesses # 26 and 36 listed below were never previously disclosed to Defendants.

    5.    Exclude reference to Defendant Manuele as "Reserve Officer Manuele."

    6.    Exclude improper character evidence in relation to Ruben Mesa Morales.

    7.    Exclude and/or limit certain photographic evidence, such as photos of the decedent during his life, funeral, autopsy, and others.

    8.    Exclude any evidence of prior officer involved shootings occurring in the City of Delano.

    9.    Exclude any previously employment history of Officer Manuele.

    10.    Exclude any prior disciplinary history of any officer.

    11.    Exclude any opinion evidence regarding trajectory of the round fired by Officer Mejia or the body positioning of the decedent, except through a qualified expert.

## V.  Relief Sought

    Plaintiffs' allege general and special damages to be proven at trial with punitive and exemplary damages against defendants Mejia and Manuele. In this wrongful death action, the plaintiffs are entitled to recovery of harms and losses for the loss of Ruben Mesa Morales' earnings, as well as for Ruben Mesa Morales' burial and funeral expenses.  Plaintiff's economic expert, Jubin Merati, has offered his expert opinion as to the value of plaintiffs' economic damages.  Plaintiffs, as the prevailing party in this action, would also be entitled to an award of attorneys' fees pursuant to 42 U.S.C. Section 1988.  Moreover, as statutory heirs, they are also entitled to non-economic damages for their loss of care, comfort and society of Ruben Morales. Finally, punitive and exemplary damages will be sought against the individual defendants, Mejia and Manuele, for their conduct in maliciously causing an illegal entry into Ruben Mesa Morales' apartment and the subsequent killing of Ruben Mesa Morales.

### VI.  Points of Law

**A.  Plaintiffs' Contentions**

The Plaintiffs' claims for relief to be presented at the time of trial are submitted herein. Plaintiffs plan to pursue the following claims against the defendants:

**Claim 1:**  Defendants Mejia and Manuele Violated the Constitutional Rights of Plaintiffs, As Successors-In-Interest, Under The Fourth and Fourteenth Amendments, pursuant to Title 42, United States Code § 1983;

**Claim 2:**  Defendants Mejia and Manuele Violated the Constitutional Rights of Plaintiffs, As Individuals, Under The Fourth and Fourteenth Amendments, pursuant to Title 42, United States Code § 1983:

**Claim 3:**  Defendant City of Delano Is Liable for the Violations of the Constitutional Rights of Plaintiffs, As Successors-In-Interest, pursuant to Monell v. New York Dept. of Social Services, (1978) 36 U.S. 658, 694;

**Claim 4:**  Defendants City of  Delano and Chief DeRosia Are Liable for the Violations of the Constitutional Rights of Plaintiffs, As Successors-In-Interest, Under 42 U.S.C. §1983 (Supervisory Liability) ;

**Claim 5:**  Defendants Are Liable To Plaintiffs, As Individuals, for the Wrongful Death of Ruben Mesa Morales;

**Claim 6:**  Defendants Mejia and Manuele Are Liable To Plaintiffs,  As Successors-In-Interest, For Negligently Breached Their Duty By Illegally Entering Ruben Mesa Morales' Home and Using Excessive Deadly Force Against Ruben Mesa Morales; and

**Claim 7:**  Defendant Mejia Is Liable To Plaintiffs, As Successors-In-Interest, For Committing A Battery on Ruben Mesa Morales.

Defendants assert that Plaintiffs Claims No. 3, 4, 6 and 7 were not alleged by Plaintiffs as

successors-in-interest, but as individuals in the SAC.  The Defendants' affirmative defenses to be presented at the time of trial are submitted herein:

**Affirmative Defense 1:**      Defendant Mejia's and Defendant Manuele's use of force was reasonable in light of the circumstances.

**Affirmative Defense 2:**      Defendant Mejia and Defendant Manuele are entitled to qualified immunity.

**Affirmative Defense 3:**      In the absence of any federal violation, Plaintiffs' state claims fail.

**Affirmative Defense 4:**      Defendant City of Delano is not liable because there is no individual liability.

**Affirmative Defense 5:**      Defendant City of Delano is not liable to Plaintiffs under a Monell theory of liability.

**Affirmative Defense 6:**      Defendant Chief DeRosia is being sued only in his official capacity and therefore must be dismissed.

**Affirmative Defense 8:**      Defendant Mejia's and Defendant Manuele's entry into the residence was justified by Nunez's apparent authority to consent to entry of the residence.

## A.      Plaintiffs Contend That Defendants Violated Mr. Morales' Civil Rights By Illegally Searching His Home And Then Shooting Him To Death

In this case, plaintiffs, as successors-in-interest, have pled a Section 1983 claim for relief based upon defendants' violations of decedent Morales' federally protected rights under the Fourth and Fourteenth Amendments. Plaintiffs contend decedent Mr. Morales was deprived of his constitutional rights to be free from (a) illegal search and seizure, and (b) excessive and unreasonable force.  Defendants contend that Defendants Manuele and Mejia did not violate Ruben Mesa Morales' constitutional rights because (a) their search of the residence was lawful;

and (b) the force used was reasonable under the circumstances and (c) Defendants Manuele and Mejia are entitled to qualified immunity.

### 1.    Plaintiffs Contend That Defendants Illegally Searched Mr. Morales' Home As They Had No Warrant, No Consent And There Were No Exigent Circumstances.

Defendants' warrantless search was not conducted pursuant to an exigent circumstance or an emergency. Plaintiffs' further contend that  a 9-1-1 call, by itself, is not valid implied consent – or even express consent -- for the police to enter or search a residence.  Thompson v. Louisiana, 469 U.S. 17, 22 (1984);  U.S. v. Shaibu, 920 F.2d 1423 (9th Cir.1990).  See also U.S. v. Deemer, 354 F.3d 1130, 1133  (9th  Cir. 2004). Thus, defendants' illegal search and seizure is actionable under Section 1983.  Kirk v. Louisiana (2002) 536 U.S. 635; Payton v. New York (1980) 445 U.S. 573; DeMayo v. Nugent (1st Cir. 2008) 517 F.3d 11, 18 (defendants denied qualified immunity after unlawful entry).

Defendants contend that the entry was lawful, whether justified by exigent circumstances, the emergency exception or consent, or that the Defendants are entitled to qualified immunity. Defendants assert that whether the entry was justified, whether by exigent circumstances, emergency exception or consent, is a question of fact for the jury to decide.

### 2.    Plaintiffs Contend That After Defendants' Unlawfully Entered Morales' Home, Defendant Reserve Officer Mejia And Defendant Manuele Unreasonably Used Excessive Force

#### a.    Plaintiffs' Contentions

The Fourth Amendment requires police officers "use only such force as is objectively reasonable under the circumstances." Scott v. Henrich (9th Cir.1994) 39 F.3d 912, 914 (emphasis added). Under both the U.S. Constitution and California law, officers cannot use deadly force unless they have "probable cause to believe that the suspect poses a significant threat of death or

serious physical injury to the officers or others." Ting v. U.S. (9th Cir.1991) 927 F.2d 1504, 1513.  In addition, police officers will be held accountable for their misconduct when they "used excessive force in creating the situation which caused [the decedent] to take the actions he did." Alexander v. City and County of San Francisco (9th Cir.1994) 29 F.3d 1355, 1366).

In the instant case, the conduct of defendant Reserve Officer Mejia was not objectively reasonable at the moment of seizure. In addition, the conduct of Officer Manuele was not objectively reasonable when he pointed his loaded service weapon at Mr. Morales. Defendant Reserve Officer Mejia shot Mr. Morales at a time when his partner, officer Manuele, had determined that Mr. Morales had no weapon and there was no need for deadly force. Indeed at the time of the shooting, Officer Manuele was holstering his firearm and reaching for his taser! Moreover, there is no evidence that Mr. Morales posed an immediate threat to the safety of the officers or others. In fact, defendants have testified that Mr. Morales did not have a weapon as he was dressed only in his boxers.  Thus, Reserve Officer Mejia's use of deadly force was patently unreasonable, especially when a real police officer (Officer Manuele) standing only feet away determined there was no need for deadly force.

Furthermore, the evidence demonstrates defendant reserve officer Mejia created the situation which caused Mr. Morales to take the actions he did.  Defendant reserve officer Mejia had illegally entered Mr. Morales' apartment in the middle of the night.  One would expect a sleepy, tired Mr. Morales to come out of his bedroom in an agitated, if not aggressive, manner. Indeed, the California Legislature has established that it is permissible to use deadly force to protect one's self or family within one's residence.  See Penal Code § 198.5.

In sum, defendant Reserve Officer Mejia used excessive force because he had created the situation by illegally entering Mr. Morales' home and then he used deadly force in killing the unarmed Mr. Morales.  Moreover, defendant Manuele used excessive force when he pointed his loaded service weapon at the unarmed Mr. Morales.

### b.      *Defendants' Assertions*

Defendants contend that the Defendants' entry into Mrs. Nunez house was constitutional and that Defendant Mejia's use of force was reasonable under the circumstances.  Graham v. Connor, 490 U.S. 386, 395 n. 10 (1989).  Defendants Mejia and Manuele are entitled to qualified immunity.  Huff v. City of Burbank, 632 F.3d 539, 547-548 (9th Cir. 2011).  Because the individual officers are entitled to qualified immunity, the City of Delano is also entitled to dismissal of all federal claims as a matter of law.  Los Angeles v. Heller, 475 U.S. 796 (1986).  Furthermore, the City of Delano is not liable under a Monell theory of liability because Plaintiffs are unable to prove that the inadequacy of the supervision and training provided amounts to deliberate indifference.  City of Canton, 489 U.S. 378, 388 (1979).  Plaintiffs will be unable to prove that additional training would have prevented the injury in the present case.  Id. at 391.  Defendant DeRosia is an unnecessary party as he is being sued in his official capacity, which is treated the same as a pleading action against an entity.  Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 n. 55 (1978).

### B.      **Plaintiffs Contend That Their Civil Rights Were Violated When Defendants Unlawfully Deprived Them Of Their Liberty Interest Arising Out Of The Familial Relations With Their Husband And Father.**

Plaintiffs may individually assert a Fourteenth Amendment claim based on the deprivation of their liberty interest arising out of the familial relations with decedent Mr. Morales.  Provencio v. Vazquez (E. D. Cal. 2009) 258 F.R.D. 626, 640.

In the present case, the deadly force used by defendants Mejia and Manuele shocks the conscience, as they created the very circumstance that forced them to resort to deadly force to resolve the situation. After all, they unlawfully entered decedent Morales' home and they had no legitimate law enforcement objective to do so, as the other officers had already cleared the Nunez' residence and found no one. Moreover, given that defendant Manuele had already decided

that decedent Morales posed no threat (and was holstering his firearm), it is reasonable to conclude that defendant Mejia's actions shocked the conscience because he acted with a purpose to harm for reasons unrelated to legitimate law enforcement objectives. Furthermore, within three years of the shooting defendant reserve officer Mejia had little or no self-defense training and little or no firearm training. He had never had any simulator training. Simply put, defendant reserve officer Mejia had not be trained to be in the situation he was in on the night he fatally shot Mr. Morales. Thus, it is reasonable to conclude that defendant reserve officer Mejia's actions shocked the conscience because he was untrained and acted with a purpose to harm for reasons unrelated to legitimate law enforcement objectives.

Defendants contend that Plaintiff R.A.M. cannot successfully maintain this action because he cannot demonstrate that state action interfered with the non-existent relationship he had with the decedent such that it would "shock the conscience."  Provencio v. Vazquez, 258 F.R.D. 626, 640 (E.D. Cal. 2009).

### C.    Plaintiffs Contend That Defendants Mejia and Manuele Were Negligent

Defendant Officer Manuele and defendant reserve officer Mejia were negligent in that they illegally entered Morales' home and, thereafter, defendant reserve officer Mejia shot Mr. Morales to death without probable cause.  See CACI 400.  Defendants' decisions and actions fell below the expected and required standard of care and reflected a deliberate indifference to the life of Mr. Morales. Defendants, as peace officers, violated their legal duty to act in accordance with the law, and the violation of such duties was the actual/proximate cause of decedent Morales' harm and plaintiffs' resulting economic and non-economic damages.

Since Defendants Mejia and Manuele did not violate Plaintiffs' federal rights, their corresponding state law claims must also be dismissed.  Simi Valley v. Superior Court (2003) 111 Cal.App. 4th 1077, 1084.  Furthermore, Plaintiffs are unable to demonstrate that either Defendant Mejia or Defendant Manuele was negligent.

**D.      Plaintiffs Contend That Defendant  Mejia Is Liable For Battery**

Defendant Reserve Officer Mejia harmed plaintiffs' father and husband by using unreasonable force in fatally shooting him. The evidence establishes that defendant Reserve Officer Mejia intentionally touched and used unreasonable deadly force against Mr.  Morales. Mr. Morales was certainly harmed by the unconsented-to touching. Defendant Reserve Officer Mejia's use of unreasonable force was a substantial factor in causing decedent Morales' harm and plaintiffs' resulting economic and non-economic damages. See CACI 1305. Plaintiffs' complaint alleges general and special damages to be proven at trial with punitive and exemplary damages against reserve officer Mejia.

Since Defendants Mejia and Manuele did not violate Plaintiffs' federal rights, their corresponding state law claims must also be dismissed.  Simi Valley v. Superior Court (2003) 111 Cal.App. 4th 1077, 1084.  A state law battery claim must be handled in the same manner as a federal claim brought pursuant to 42 U.S.C. § 1983 and, accordingly, this claim is duplicative, in that Defendant Mejia's use of force was reasonable.  Brown v. Ransweiler (2009) 171 Cal.App.4th 516; Lopez v. City of Los Angeles (2011) 196 Cal.App.4th 675.

## VII.  Abandoned Issues

Plaintiffs have not abandoned any claims for relief.

## VIII.  Witnesses

The following is a list of witnesses that the parties expect to call at trial, including rebuttal and impeachment witnesses.  NO WITNESS, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE CALLED AT TRIAL UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(10).

**A.  Plaintiffs' Witnesses**

The list of witnesses that the Plaintiffs anticipate relying upon to prove each element of

their claims is set forth below.  Plaintiffs reserves the right to offer additional witnesses for impeachment purposes, based upon the decisions of trial counsel and in rebuttal to the testimony of defendants' witnesses.

      1.      Plaintiff Manuela Cancino Contreras Morales. She can be contacted through Plaintiffs' counsel.

      2.      Plaintiff R.A.M, a minor. He can be contacted through Plaintiffs' counsel.

      3.      Robert Velasquez, plaintiffs' investigator. He can be contacted through Plaintiffs' counsel.

      4.      Defendant City of Delano Police Department Reserve Officer Jose Mejia. Mr. Mejia's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022, 12th Avenue, Delano, California, 93125.

      5.      Defendant City of Delano Police Department Officer Shaun Manuele.  Mr. Manuele's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022, 12th Avenue, Delano, California, 93125.

      6.      Defendant City of Delano Police Department Chief Mark DeRosia. Mr. DeRosia's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022, 12th Avenue, Delano, California, 93125.

      7.      City of Delano Police Department Officer Alberto Felix.  Mr. Felix' present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022, 12th Avenue, Delano, California, 93125.

      8.      City of Delano Police Department Officer Michael Adams. Mr. Adams'

present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

9.      City of Delano Police Department Officer Steve Glenn. Mr. Glenn's present residential address and telephone number are unknown to Plaintiffs. Plaintiff has been advised by defendant that Steven Glenn works for the Bakersfield Police Department.

10.     City of Delano Police Department Sergeant Ortiz. Sergeant Ortiz' present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

11.     City of Delano Police Department Commander Raul Alvizo. Mr. Alvizo's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022, 12th Avenue, Delano, California, 93125.

12.     City of Delano Police Department Officer J. Nicholson. Mr. Nicholson's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

13.     Police Department Officer R. McDermand. Mr. McDermand's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

14.     City of Delano Police Department Officer F. Rivera. Mr. Rivera's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

15.     City of Delano Police Department Corporal Rutledge. Mr. Rutledge's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

16.     City of Delano Police Department Officer M. Cervates. Mr. Cervates' present residential address and telephone number are unknown to Plaintiffs.  The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

17.     City of Delano Police Department Chaplain Bustillo. Chaplain Bustillo's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

18.     City of Delano Police Department Sergeant Donald Flores. Mr. Flores' present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

19.     City of Delano Police Department Officer Raul Garcia. Mr. Garcia's present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

20.     City of Delano Police Department Officer Julian Ortiz. Mr. Ortiz' present residential address and telephone number are unknown to Plaintiffs. The address of the City of Delano Police Department is 1022 12th Avenue, Delano, California, 93125.

21.     Juben Merati, MERATI ECONOMIC GROUP, INC.,  1875 Century Park East, Suite 1230, Los Angeles, California 90067. Telephone: (310) 888-0078.

22.     Roger Clark, Police Procedures Consultant, Inc., 10207 Molino Road, Santee, CA 92071, (208) 351-2458.

23.     Maria Nunez. Her present residential address and telephone number are 1118 Oxford Place, Delano, California, 93125; 661-721-7293.

24.     Gabriel Nunez, His present residential address and telephone number are 1118 Oxford Place, Delano, California, 93125; 661-721-7293.

25.     G.N. is a minor child of Maria and Gabriel Nunez. His present residential address and telephone number are 1118 Oxford Place, Delano, California, 93125;

661-721-7293.

26.     M.N. is a minor child of Maria and Gabriel Nunez. His present residential address and telephone number are 1118 Oxford Place, Delano, California, 93125; 661-721-7293.

27.     Maria Alvarado. Mrs. Alvarado's present residential address and telephone number are 1121 Oxford Place. Delano, California, 93125; 661-721-8821.

28.     Irene Ramos. Irene Ramos' present residential address is 1113 Oxford Place. Delano, California, 93125. Her telephone number is presently unknown to Plaintiffs.

29.     Leticia Ramirez. Leticia Ramirez's present residential address and telephone number are unknown to Plaintiffs. The address and phone number of her employer, Paramount Citrus,  are 1901 South Lexington St., Delano, California 93215; 661.720.2400.

30.     Jose Luis Rodriguez. Jose Luis Rodriguez' residential address and phone number are 1005 Melcher Road, Delano, California 93215; 661-370-8476.

31.     Kern County Fire Department Employees, Dave Witt, Ken Scott, and Fred Valov. The present residential addresses and telephone numbers of Dave Witt, Ken Scott, and Fred Valov are unknown to Plaintiffs. The address of Kern County Fire Department, Station 34 is 1001 12th Avenue, Delano, California 93125.

32.     Delano Ambulance Employees. The present residential addresses and telephone numbers of the Delano Ambulance employees are unknown to Plaintiffs. The address and phone number of the Delano Ambulance is 403 Main Street, Delano, California 93215; (661) 725-3374.

33.     Kern County District Attorney's Office Employees, Chevy Garza, Patty Poeschel, Ada Rodriguez, Dianne Mathias and Maria Sanchez. The present residential

addresses and telephone numbers of Chevy Garza, Patty Poeschel, Ada Rodriguez, Dianne Mathias and Maria Sanchez are unknown to Plaintiffs. The address of the Kern County District Attorney's Office is 1215 Truxtun Avenue, Bakersfield, CA 93301.

34.     Kern County Sheriff's Department, Coroner's Division, Employees, James Holt, Dr. Thomas Beaver, and Isabel Parra. The present residential addresses and telephone numbers of James Holt, Dr. Thomas Beaver, and Isabel Parra are unknown to Plaintiffs. The address of the Kern County Sheriff's Department, Coroner's Division is 1832 Flower Street, Bakersfield, CA 93305.

35.     Delano Regional Medical Center Employees, Dr. Schrabi and Flor Pedrossa. The present residential addresses and telephone numbers of Dr. Schrabi and Flor Pedrossa are unknown to Plaintiffs. The address and phone number of the of the Delano Regional Medical Center is 1401 Garces Highway, Delano, California 93215; 661.725.4800.

36.     Custodian of Records for U.S. Army records for Ruben Mesa Morales.

**B.  Defendants' Witnesses**

Defendants intend to call the following witnesses in its case-in-chief.  Defendants reserve the right to call additional witnesses in rebuttal:

1.     Plaintiff Manuela Cancino Contreras Morales individually and as guardian ad litem for Plaintiff R.A.M. She can be contacted through Plaintiffs' counsel.

2.     Plaintiff R.A.M, a minor. He can be contacted through Plaintiffs' counsel.

3.     Defendant City of Delano Police Department Officer Jose Mejia.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

4.     Defendant City of Delano Police Department Officer Shaun Manuele. City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

5.     Defendant City of Delano Police Department Chief Mark DeRosia. City of

32

Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

6.      City of Delano Police Department Officer Alberto Felix. City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

7.      City of Delano Police Department Officer Michael Adams.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

8.      City of Delano Police Department Officer Steve Glenn. Currently with Bakersfield Police Department.

9.      City of Delano Police Department Officer Martin Cervantes.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

10.      City of Delano Police Department Officer J. Nicholson.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

11.      City of Delano Police Department Sergeant Julian Ortiz.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

12.      City of Delano Police Department Officer B. Rutledge.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

13.      City of Delano Police Department Officer A. Gonzalez.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

14.      City of Delano Police Department Dispatcher Raul Garcia.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

15.      City of Delano Police Department Officer F. Rivera.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

16.      City of Delano Police Department Sergeant Flores.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

17.      City of Delano Police Department Detective Ruben Campos.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

18.     City of Delano Police Department Detective R. McDermand.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

19.     City of Delano Police Department Officer Conde.  City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

20.     Records Supervisor Liz Salim, City of Delano Police Department, 1022 12th Avenue, Delano, California, 93125.

21.     California Highway Patrol Dispatcher who received call and transferred it to Delano Police Department and/or the person who transcribed that call.

22.     City of Delano Fire Department Captain Dave Witt.

23.     City of Delano Fire Department Engineer Ken Scott.

24.     City of Delano Fire Department Firefighter Fred Valov.

25.     Stella Morales, 471 Sawyer Road, Cameron, North Carolina.

26.     Ruben Morales, Jr., 471 Sawyer Road, Cameron, North Carolina.

27.     Joseph John Callanan, Jr., Joe Callanan and Associates, Specialized Training Consultants, 2900 N. Government Way – PMB 324, Coeur d'Alene, Idaho 83815.

28.      Darryl R. Zengler.  Zengler & Inouye, LLC, 4 East Holly Street, Suite 205, Pasadena, CA 91103-3900 (626) 405-1999.

29.     Maria Nunez, 1118 Oxford Place, Delano, CA 93215.

30.     Manuela Holguin Contreras Morales, Ciudad Jimenez, Chihuahua, Mexico.

31.     Edgar Morales, Ciudad Jimenez, Chihuahua, Mexico.

32.     Mario Morales, Ciudad Jimenez, Chihuahua, Mexico.

33.     Jennifer Morales, Ciudad Jimenez, Chihuahua, Mexico.

## IX.  Exhibits

The following is a list of documents or other exhibits that the parties expect to offer at trial.  NO EXHIBIT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(11).

**A.**      **Plaintiff's List of Exhibits**

| No. | Letter | Exhibit Description |
|-----|--------|---------------------|
| 1 |  | Picture of Mr. Morales and his Family |
|  | A | Picture of Mr. Morales in Uniform |
|  | B | Picture of Family Portrait of all three |
|  | C | Picture of Mr. Morales and Manuela |
|  | D | Picture of Mr. Morales In suit |
|  | E | Picture of Mr. Morales |
|  | F | Picture of Mr. Morales |
|  | G | Picture of Sand Art |
|  | H | Video from Funeral |
|  | I | Picture from Funeral |
|  | J | Picture from Funeral |
|  | K | Picture from Funeral |
|  | L | Picture from Funeral |
|  | M | Picture from Funeral |
|  | N | Picture from Funeral |
|  |  |  |

| No. | Letter | Exhibit Description |
|---|---|---|
|  | O | Picture of Manuela |
|  | P | Picture of Manuela |
|  | Q | Picture of Manuela |
|  | R | Picture of Manuela |
|  | S | TDB |
|  | T | TDB |
|  | U | Marriage license |
|  | V | Birth Certificate for Little Ruben |
|  | W | Records from the Army |
|  | X,Y,Z | Reserved |
| 2 |  | Pictures of Mr. Morales at Hospital |
|  | A | Face with Tube |
|  | B | Left hand with ring |
|  | C | Right hand |
|  | D | Left arm both wounds |
|  | E | Arm exit wound |
|  | F | Chest wound |
|  | G | Chest wound close up |
|  |  |  |
| 3 |  | Pictures of Mr. Morales at Autopsy |
|  | A | Face up |
|  | B | Left hand with ring |
|  | C | Trajectory with wire |
|  | D | Trajectory with wire arm pinched |

36

| No. | Letter | Exhibit Description |
|---|---|---|
|  |  |  |
|  | E | Trajectory with wire looking up |
|  | F | Entrance wound |
|  | G | Arm exit wound |
|  | H | Chest entrance wound |
|  | I | Bullet |
|  |  |  |
| 4 |  | Pictures of area from the Air |
|  | A | Aerial Facing East |
|  | B | Aerial Facing North |
|  | C | Aerial facing South |
|  | D | Aerial facing West |
|  | E | Property Lines |
|  |  |  |
| 5 |  | Pictures of Exterior of house July 7, 2009 |
|  | A | Front of house with Morales Van |
|  | B | Front porch |
|  | C | Right side of house |
|  | D | Open gate on right side |
|  | E | Back yard next to house |
|  | F | Back yard from middle |
|  | G | Back yard patio |
|  | H | Back yard patio with doors |
|  | I | Back yard patio from corner |

37

| No. | Letter | Exhibit Description |
|-----|--------|---------------------|
|     | J      | Front driveway gated |
|     | K      | Front driveway gated with Morales window |
|     |        |  |
| 6   |        | Pictures of Exterior of house April 2, 2010 |
|     | A      | Front of house left side |
|     | B      | Front of house middle |
|     | C      | Front of house right side looking down street |
|     | D      | Back yard |
|     | E      | Back yard tree in middle |
|     | F      | Back yard with Shed |
|     | G      | Back yard from Patio corner |
|     | H      | Back yard Patio light |
|     | I      | Back yard light switch |
|     | J      | Side of house |
|     | K      | Side of house light |
|     |        |  |
| 7   |        | Pictures of Interior of Nunez residence |
|     | A      | Fireplace |
|     | B      | Two couches toward hallway |
|     | C      | Into hallway |
|     | D      | In hallway |
|     | E      | Into Bedroom and bathroom |
|     | F      | Into bathroom |
|     |        |  |

| No. | Letter | Exhibit Description |
|-----|--------|---------------------|
| 8 | | Blood Stains and Bullet location |
| | A | Location marker 1 wide angle |
| | B | Location marker 1 tight  blood stain |
| | C | Location marker 2 wide angle |
| | D | Location marker 2 tight Bullet |
| | E | Couch left top |
| | F | Couch left top |
| | G | Couch straight down with ruler |
| | H | Couch close up |
| | I | Couch blood spots up close |
| | J | Couch blood spot very close |
| | K | Side of couch |
| | L | Wall left of couch |
| | M | Wall left of couch with ruler |
| | N | Heater with ruler |
| | O | wall with ruler left of couch |
| | P | Door jamb with blood and ruler |
| | Q | Floor by bucket with ruler |
| | | |
| 9 | | Pictures of Interior of Morales residence |
| | A | Looking into the room |
| | B | Looking in to the left |
| | C | Looking at bathroom door from sink |
| | D | Looking out the front door |

| No. | Letter | Exhibit Description |
|-----|--------|---------------------|
|     | E | Looking out door from far corner |
|     | F | Looking at sink from refrigerator |
|     | G | Looking down the hallway |
|     | H | Looking at refrigerator from sink |
|     | I | Looking at couch from sink |
|     | J | Looking at stove from couch |
|     | K | Water cooler |
|     | L | bathroom into bedroom |
|     | M | bathroom mirror with post it |
|     | N | bathroom into bedroom door width |
|     | O | From bathroom into bedroom |
|     | P | Bedroom from closet |
|     | Q | Bedroom closet from window |
|     | R | Bedroom door to front with post its |
|     | S | bedroom exit  and front entrance |
|     | T | Width bedroom into bathroom |
|     | U | Incline bedroom into bathroom |
|     | V | Width coming into bathroom |
|     | W | Width to door knob into bathroom |
|     | X | Width into living room |
|     | Y | TDB |
|     | Z | TDB |
| 10  |   | Pictures of officers |
|     | A | Pictures of Mejia (3 pages) |

40

| No. | Letter | Exhibit Description |
| --- | --- | --- |
| | B | Pictures of Manuele (3 pages) |
| 11 | | Diagram of residence by Matthias |
| 12 | | Crime Scene Log (Bates D34-34) |
| 13 | | Dispatch logs Bates (Bates P72 -74) |
| 14 | | Video Deposition Of Dispatcher Garcia and transcript |
| 15 | | Chart Unit numbers and Badge numbers on July 7, 2009 |
| 16 | | Diagram (detailed) of house by Robert Velasquez |
| 17 | | Shooting Review Committee Report |
| 18 | | Internal Affairs Report |
| 19 | | TBD |
| | | |
| 20 | | Officer Mejia Material |
| | A | Diagram of Exterior |
| | B | Diagram of Interior |
| | C | Aerial Picture |
| | D | Report |
| | E | Mejia is Victim report |
| | F | Picture of the Kitchen |
| | G | TDB |
| | H | TDB |
| | I | TBD including Video depositions, transcripts, depo Exhibits |
| | J | TBD including Video depositions, transcripts, depo Exhibits |
| | K | TBD including Video depositions, transcripts, depo Exhibits |
| | L | TBD including Video depositions, transcripts, depo Exhibits |

| No. | Letter | Exhibit Description |
|---|---|---|
| | M | TBD including Video depositions, transcripts, depo Exhibits |
| | N | TBD including Video depositions, transcripts, depo Exhibits |
| | O | TBD including Video depositions, transcripts, depo Exhibits |
| | P | Personnel file pages |
| | Q | TBD including statements to Investigators |
| | | |
| 20 | R | TBD including statements to Investigators |
| | S | TBD including statements to Investigators |
| | T | TBD including statements to Investigators |
| | U | TBD including statements to Investigators |
| | V | TBD including statements to Investigators |
| | W | TBD |
| | X | TBD |
| | Y | TBD |
| | Z | TBD |
| | | |
| 30 | | Officer Manuele Material |
| | A | Diagram of Exterior |
| | B | Diagram of Interior |
| | C | Aerial Picture |
| | D | Report |
| | E | Picture of patio |
| | F | |
| | G | TDB |

42

| No. | Letter | Exhibit Description |
|-----|--------|---------------------|
|     | H      | TDB                 |
|     | I      | TBD including Video depositions, transcripts, depo Exhibits |
|     | J      | TBD including Video depositions, transcripts, depo Exhibits |
|     | K      | TBD including Video depositions, transcripts, depo Exhibits |
|     | L      | TBD including Video depositions, transcripts, depo Exhibits |
|     | M      | TBD including Video depositions, transcripts, depo Exhibits |
|     | N      | TBD including Video depositions, transcripts, depo Exhibits |
|     | O      | TBD including Video depositions, transcripts, depo Exhibits |
|     | P      | Personnel file pages |
|     | Q      | TBD including statements to Investigators |
|     | R      | TBD including statements to Investigators |
|     | S      | TBD including statements to Investigators |
|     | T      | TBD including statements to Investigators |
|     | U      | TBD including statements to Investigators |
|     | V      | TBD including statements to Investigators |
|     | W      | TBD |
|     | X      | TBD |
|     | Y      | TBD |
|     | Z      | TBD |
| 40  |        | Officer Felix Material |
|     | A      | Diagram of Exterior |
|     | B      | Diagram of Interior |
|     | C      | Aerial Picture |
| 40  | D      | Report |

43

| No. | Letter | Exhibit Description |
|-----|--------|---------------------|
|  |  | TBD including Video depositions, transcripts, depo Exhibits |
|  |  | TBD including Video depositions, transcripts, depo Exhibits |
|  |  |  |
| 50 |  | Officer Adams Material |
|  | A | Diagram of Exterior |
|  | B | Diagram of Interior |
|  | C | Aerial Picture |
|  | D | Report |
|  | E | TBD including Video depositions, transcripts, depo Exhibits |
|  | F | TBD including Video depositions, transcripts, depo Exhibits |
|  |  |  |
| 60 |  | Officer Cervantes Material |
|  | A | Diagram of Exterior |
|  | B | Diagram of Interior |
|  | C | Aerial Picture |
|  | D | Report |
|  | E | TBD including Video depositions, transcripts, depo Exhibits |
|  | F | TBD including Video depositions, transcripts, depo Exhibits |
|  |  |  |
| 70 |  | Sgt. Ortiz Material |
|  | A | Diagram of Exterior |
|  | B | Diagram of Interior |
|  | C | Aerial Picture |
|  | D | Report |

| No. | Letter | Exhibit Description |
|-----|--------|---------------------|
|     | E | TBD including Video depositions, transcripts, depo Exhibits |
|     | F | TBD including Video depositions, transcripts, depo Exhibits |
|     |   |   |
| 80  |   | Officer Nicholson Material |
|     | A | Diagram of Exterior |
|     | B | Diagram of Interior |
|     | C | Aerial Picture |
|     | D | Report |
|     | E | TBD including Video depositions, transcripts, depo Exhibits |
|     | F | TBD including Video depositions, transcripts, depo Exhibits |
|     |   |   |
| 90  |   | Commander Alvizo Material |
|     | A | TBD including Video depositions, transcripts, depo Exhibits |
|     | B | TBD including Video depositions, transcripts, depo Exhibits |
|     |   |   |
| 100 |   | Chief Mark DeRosia Material |
|     | A | Memo Police Shooting review Board (D 36) |
|     | B | Delano Police Department organizational chart (P 243) |
|     | C | Policy Preamble |

**B. Defendants' Exhibits**

      Defendants may use the following exhibits at trial.  Defendants reserve the right to use additional exhibits in rebuttal:

    1.     Deposition excerpts as noted below in "DISCOVERY DOCUMENTS", including

45

any audio or video recordings of those deposition excerpts;

2.      Delano Police Department Incident report, drafted by Officer Rivera, arising out of a burglary investigation taking place 7/7/09, which also includes ten (10) supplemental reports by various Delano Police Department Officers, including Officer Cervantes, Detective Nicholson, Corporal McDermand, Officer Felix, Officer Glenn, Officer Adams, Officer Manuele, Officer Rutledge, and Sergeant Ortiz, and a property movement form.

3.      Declaration of Manuela Morales indicating that she is the proper successor in interest, her marriage certificate to the decedent, and the declaration she submitted in opposition to Defendants' motion to dismiss.

4.      Judgment dissolving marriage of Stella and Ruben Morales dated February 7, 2002

5.      Approximately 140 separate photographs of 1118 Oxford Place, Delano, California, 93125, including photos from the front of the house, the side of the house, the side yard of the house, the back yard of the house, the back of the house, the back patio of the house, the room where the officers encountered the decedent, the hallway/bathroom of the apartment conversion, and the unpermitted, converted garage living area.

6.      Three separate diagrams of 1118 Oxford Place, Delano, California, 9312, which include a general diagram of the property structure, the unpermitted, converted garage living area and a detailed entire house diagram.

7.      Photographs of Defendant Mejia and Defendant Manuele taken immediately following the incident giving rise to this litigation.

8.      Interview transcripts from Defendant Manuele's voluntary interview with Kern County DA's Office on July 7, 2009.

9.      Interview transcripts from Defendant Mejia's voluntary interview with Kern County DA's Office on July 7, 2009.

10.      Various training records of Defendant Mejia including: Arrest & Control/Firearms

certificate, Certificates of Completion for both Level III and Level II Reserve Officer, and the Reserve Officer Training Guide related specifically to Defendant Mejia.

11.     Transcripts of audio recordings of Nunez call to dispatch as the audio recordings of the 911 calls.

12.     Audio recording of Nunez dispatch call.

13.     Transcripts from Nunez' interview with Delano Police.

14.     Dispatch logs/CAD Logs.

15.     Code enforcement violations memo dated July 9, 2009 by Officer Gonzalez.

16.     Delano Police Department Policy Manual.

17.     Coroner's Report of Autopsy dated July 8, 2009 and the toxicology reports related to the decedent, Ruben Morales.

18.     Various Kern County District Attorney's documents including the Bureau of Investigators OIS Case Report and the DA's OIS Office Memorandum finding no criminality on the part of the officers.

19.     Examination Reports from the Kern County Regional Criminalistics Laboratory.

20.     Report of Analysis of Mejia conducted by the Kern County Crime Laboratory dated July 14, 2009.

21.     Documents relied upon by expert Zengler including Zengler's CV, report, medical records of the decedent, military records, and employment records.

22.     Documents relied upon by expert Merati, including Merati's CV, testimony list, report, and records of the decedent and Plaintiffs that assisted him in formulating his opinion.

23.     Documents relied upon by expert Callanan including his CV, testimony list, report and all records upon which his opinion is based.

24.     Documents relied upon by Roger Clark including his CV, testimony list, report, his

47

declaration dated October 21, 2011, and all records upon which his opinion is based.

25.     Documents and audio/video recordings relied upon by expert Callanan including police reports, District Attorney investigative reports, photographs, crime lab records, transcriptions of interviews and statements, transcription and audio of 911 call, deposition transcripts,  Delano Police Department Policy Manual, Training Records of officers, documents provided by Plaintiffs regarding photographs and video recordings of decedent.

26.     Documents from Manuela Contreras Holguin Morales verifying her marriage to the decedent including:  the Marriage Certificate, Birth Certificates (for Edgar Morales, Jennifer Morales, Mario Morales, and Manuela Holguin Morales), a carta de autorisacion dated July 7, 2005, a photo from the wedding between decedent and Manuela Holguin Morales, two letters from the decedent to Manuela Holguin Morales, and two emails sent to the Court from Manuela Contreras Holguin Morales.

27.     Any other documents that may dispute any of the Plaintiffs' allegations or support an affirmative defense.


**X.  Discovery Documents To Be Used At Trial (Answers To Interrogatories And Responses To Requests For Admissions**

The list of discovery documents that the Plaintiffs may rely upon to prove an element of their claims are set forth below. Plaintiffs reserves the right to offer additional discovery documents for impeachment purposes, based upon the decisions of trial counsel and in rebuttal to the testimony of defendants' witnesses or exhibits and other documentary evidence.

1.     Deposition of Officer Shaun Manuele;

2.     Deposition of  Reserve Officer Jose Mejia;

3.     Deposition of Chief Mark DeRosia;

4.     Deposition of Reserve Officer Michael Adams;

5.      Deposition of Sgt. Julian Ortiz;

6.      Deposition of Commander Raul Alvizo;

7.      Deposition of Officer Rivera;

8.      Deposition of Officer Donald Flores;

9.      Deposition of Officer Alberto Felix;

10.     Deposition of Officer Martin Cervantes;

11.     Deposition of Officer Steven Glenn;

12.     Deposition of Officer Jerry Nicholson; and

13.     Deposition of Officer Raul Garcia.


The Defendants may rely upon the following discovery documents, specifically transcripts from depositions, of the witnesses set forth below.  Defendants reserve the right to offer additional discovery documents for impeachment purposes, based upon the decisions of trial counsel and in rebuttal to the testimony of Plaintiffs' witnesses or exhibits and other documentary evidence.  Therefore, pursuant to Local Rule 281(b)(12), the Defendants designate that the following excerpts of depositions may be presented:

1.      Deposition of Maria Nunez: 12:6-19, 23-25; 13:1-5, 16-25; 14:11-13; 16:19 to 17:8; 18:16-21; 19:10-12; 28:16-25; 29:6-25; 30:9 to 31:3; 31:4-25; 32:20 to 33:4; 33:17-22; 34:19 to 35:3; 35:22 to 36:14; 36:20-23; 37:8-16; 38:6-13; 39:13; 42:7; 46:1-3; and 50:13-19; and

2.      Deposition of Plaintiff Manuela Cancino Contreras Morales: 6:12-19; 8:2-6; 13:14-21; 15:17-25; 16:5-10; 16:23 to 18:9; 19:13-20; 20:2-9; 21:12 to 23:6; 23:15 to 25:11; 25:25 to 26:3; 26:15 to 28:4; and 54:16 to 56:2.

## XI.  Further Discovery or Motions

Plaintiffs have no further requests for discovery. Plaintiffs contemplate filing motions *in limine* as set forth above in the Disputed Evidentiary Issues Section.

49

Defendants intend to file motions in limine and bifurcation as noted above.

Additionally, the Defendants intend to call several witnesses not discovered and/or located until after the discovery cut-off date of June 6, 2011.  These witnesses and evidence include two other wives of the decedent as well as children, which will go directly towards damages.

First, on December 20, 2011, Defendants notified Plaintiffs of their intent to call Stella Morales and Ruben Morales to testify at the trial in a Supplemental Rule 26 Initial Disclosure.  Although Plaintiff Manuela Morales, at her deposition in April 2011, discussed Stella Morales in a deposition, it took Defendants quite some time to locate Mrs. Stella Morales.  Once located, the Defendants had to send a private investigator to North Carolina to find Mrs. Morales and gain her cooperation.  It was not until November 2011 that the Defendants were able to gain the cooperation of Mrs. Morales and it was not until December 2011 that Mrs. Morales agreed to put the Defendants in touch with her son, Ruben Jesus Morales.

After alerting Plaintiffs' counsel of these additional witnesses, Plaintiffs objected to them because they were not disclosed until after the discovery cut-off date.  In a letter dated January 5, 2012, Defendants offered Plaintiffs the opportunity to take the depositions of either (or both) Stella Morales or Ruben Morales.  Plaintiffs declined the offer; however, they did send their own private investigator to North Carolina in February 2012 to contact both Stella Morales and Ruben Morales.  Plaintiffs have had the opportunity to prepare for these witnesses and the documents provided, which prove that the decedent was still married to Stella Morales when he married the Plaintiff.

Additionally, Stella Morales and Ruben Morales will be able to testify as to the type of husband and father that the decedent was so that a jury can make a fair evaluation for damages.  Additionally, Stella Morales will testify that the decedent's military pension belongs to her and that she was, and still is, receiving the benefits of that pension – a benefit that Plaintiff

50

Manuela Morales contends she has been deprived as a result of the decedent's death.

Second, in March 2012, the Court and all parties began receiving emails from a woman in Mexico named Manuela Holguin Contreras Morales, who alleged she is the legitimate wife of the decedent. In a later email, she provided documentation which appeared to verify her contentions. On May 22, 2012, Defendants submitted a Second Supplemental Rule 26 Initial Disclosure informing Plaintiffs of their intent to call Mrs. Holguin, as well as her four children, as possible witnesses in this matter and attached to those disclosures all of the documents Mrs. Holguin provided in an email. On June 18, 2012, Plaintiffs objected to Defendants intent to call Mrs. Holguin and her children as witnesses and, again, in a letter dated July 3, 2012, Defendants indicated that they would have no objection if Plaintiffs wished to take the deposition of Mrs. Holguin. Plaintiffs have not indicated a willingness to take the deposition of Mrs. Holguin.

Mrs. Holguin is currently represented by Mexican counsel and is actively seeking American counsel to intervene in this action. At a very minimum, the Defendants believe her testimony is necessary to the question of damages since she is the legitimate wife of the decedent. Furthermore, she will testify that the decedent moved in with her for several years in the City of Jimenez in the State of Chihuahua, Mexico from approximately 2000 until approximately 2008, when he moved to Delano, California.

Mrs. Holguin has indicated a willingness to have her deposition taken but it may have to be taken in Mexico because, at the moment, she does not have a passport but is working on obtaining one. She indicated that she may be able to make herself available for a deposition in El Paso, Texas depending on whether she can get a passport. In any event, it is necessary to take her deposition so that, in the event she is unavailable for trial, her deposition testimony can be presented to a jury. Therefore, the Defendants would anticipate that further discovery is necessary in this regard.

Once a district court has filed a pretrial scheduling order pursuant to Federal Rule

of Civil Procedure 16, that Rule's standards control. *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607-08 (9th Cir. 1992).  Prior to the final pretrial conference, a court may modify a status order upon a showing of "good cause."  See Fed. R. Civ. P. 16(b).  Additionally, the Local Rules of Practice for the United States District Court, Eastern District of California, Rule 281(b)(13) permits a party to request further discovery at the pretrial conference.

"Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)('s good cause standard primarily considers the diligence of the party seeking the amendment." *Johnson*, 975 F.2d at 609.  In explaining this standard, the Ninth Circuit has stated that:

> "[a] district court may modify the pretrial schedule if it cannot reasonably
> be met despite the diligence of the party seeking the extension.' Moreover,
> carelessness is not compatible with a finding of diligence and offers no reason for
> granting of relief.  Although the existence or degree of prejudice to the party
> opposing the modification might supply additional reasons to deny a motion, the
> focus of the inquiry is upon the moving party's reasons for seeking modification.  If
> that party was not diligent, the inquiry should end." *Id*.

The Defendants have certainly been diligent.  First, no one knew of the existence of Manuela Contreras Holguin Morales until she sent emails to the Court advising of her status as the legitimate wife.  Certainly her testimony will go towards damages.  The same is true regarding Stella Morales and Ruben Morales.  While Plaintiff Manuela Morales provided a name of a wife living in North Carolina, it took some time for the Defendants to track her down and to obtain her cooperation.  None of this could have happened prior to the discovery cutoff in this matter and, accordingly, additional discovery is necessary so that, at a minimum, a deposition may be presented at trial in the event that the witnesses are unavailable to testify at trial.

Plaintiffs dispute defendants' contention that they were diligent. Plaintiffs will be extremely prejudiced if defendants are allowed to call these witnesses to testify at trial. If Defendants had intended to call these witnesses at trial, they should have been previously

identified, and Defendants' failure to do so precludes Defendants from calling them to testify and also that other appropriate sanctions be imposed against them.

## XII.  Stipulations

The parties are contemplating stipulations regarding the admissibility of documents for trial purposes.

Plaintiffs had also requested that defendants stipulate to a couple of minor clerical corrections to the current operative complaint, the Second Amended Complaint. The clerical corrections were to the introductory headings for the second through sixth claims as such headings did not clearly specify which causes of action are being brought by plaintiffs in their individual capacity, and which are being brought in their capacity as successors-in-interest to Ruben Mesa Morales.  Defendants assert that Plaintiffs had requested that the Defendants to enter into a stipulation to permit the filing of a third amended complaint but abandoned that request. Pursuant to the FRCP, Rule 16, the Plaintiffs would have to demonstrate the necessary good cause to the Court why such an amendment was not timely made.  Additionally, the Defendants assert that the errors are not 'minor clerical corrections' but are significant in the manner in which plaintiffs elected to plead their case.

## XIII.  Amendments/Dismissals

The parties are not contemplating any amendments or dismissals.

## XIV.  Settlement Negotiations

On January 24, 2011, the Defendants submitted separate Rule 68 offers to the individual plaintiffs, which were rejected by plaintiffs.

There has been one settlement session on August 5, 2011, before retired Judge Richard L. Gilbert in Sacramento. The parties were not able to reach an agreement because they were far apart at the mediation.

On February 16, 2012, Plaintiffs sent a settlement demand letter to the Defendants. The

demand with the defendants offering only the amounts previously offered in their Rule 68 offers.

Plaintiffs would entertain a court settlement conference before a U.S. District Judge.   The Defendants are not opposed to a settlement conference before a U.S. District Judge; however, if Plaintiffs demands are anywhere the same amounts as they were at the mediation, such a conference would be futile.

### XV.  Agreed Statement

The parties have opined that an agreed statement of the case is neither feasible or advisable, however the parties will be asked to meet and confer to attempt to develop an agreed statement.

### XVI.  Separate Trial Of Issues

Plaintiffs contend that a separate trial of issues is not feasible or advisable.

Defendants may file a motion to trifurcate the proceedings.  Specifically, the Defendants will request that the question of individual liability be first determined before the jury is asked to consider liability questions under *Monell*.  Finally, the Defendants will request that the damages phase of the litigation, if any, be separate from the liability phase(s).  Plaintiffs will oppose a motion to trifurcate as it will needlessly delay the proceedings.

### XVII.  Impartial Experts - Limitation Of Experts

The appointment by the Court of impartial expert witnesses or the limitation of the number of expert witnesses is not advisable.

### XVIII.  Attorneys' Fees

Plaintiffs will be seeking an award of attorneys' fees pursuant to 42 U.S.C. Section 1988. Defendants contend that if attorneys' fees are to be awarded, such may be limited by the Rule 68 offers submitted early on in this litigation.

### XIX.  Further Trial Preparation

### A.  Final Witness List

The parties are ordered to file and serve their final list of witnesses by Thursday, October 25, 2012.  Additionally, at that time Plaintiffs shall disclose the order of witnesses so that Defendants will be prepared for cross-examination.

Except upon the showing set forth above in section VIII, a party may not add witnesses to the final list of witnesses, or to any other updated witness list, who are not disclosed in this Order in Section VIII.

### B.  Trial Briefs

The parties are directed to file and serve a Trial Brief by Thursday, October 4, 2012.  Local Rule 16-285.  The parties need not include in the Trial Brief any issue that is adequately addressed in a motion in limine, or in an opposition brief to a motion in limine.  Any response to a Trial Brief shall be filed and served by October 9, 2012.

In addition to the matters set forth in Local Rule 16-285, the parties shall in particular discuss the following point of law in their trial briefs:

The parties are ordered to confer no later than September 17, 2012 for purposes of pre-marking and examining each other's exhibits.  All joint exhibits must be pre-marked with numbers preceded by the designation JT/-- (e.g., JT/1, JT/2).  All of Plaintiffs' exhibits shall be pre-marked with numbers.  All of Defendants' exhibits shall be pre-marked with letters.

1.  Counsel shall create four (4) complete, legible sets of exhibits in binders as follows:

(a) Two sets of binders to be delivered not lather than Thursday, October 25, 2012, to Courtroom Clerk Harold Nazaroff , one for use by the Courtroom Clerk and the other for the court; and

(b)  One set for each counsel's own use.

If the parties desire, they may have a fifth set of binders to be used for the purposes

of questioning witnesses.

2.  Counsel are to confer and make the following determination with respect to each proposed exhibit to be introduced into evidence, and to prepare separate indexes - one listing joint exhibits, and one listing each party's separate exhibits:

(a)  Duplicate exhibits, i.e., documents which both sides desire to introduce into evidence, shall be marked as a joint exhibit, and numbered as directed above.  Joint exhibits shall be listed on a separate index, and shall be admitted into evidence on the motion of any party, without further foundation.

(b)  As to exhibits that are not jointly offered, and to which there is no objection to introduction, those exhibits will likewise be appropriately marked, e.g., Plaintiffs' Exhibit 1 or Defendants' Exhibit A, and shall  be listed in the offering party's index in a column entitled "Admitted In Evidence."  Such exhibits will be admitted upon introduction and motion of the party, without further foundation.

(c)  Those exhibits to which the only objection is a lack of foundation shall be marked appropriately, e.g., Plaintiffs' Exhibit 2 - For Identification, or Defendants' Exhibit B - For Identification, and indexed in a column entitled "Objection Foundation."

(d)  Remaining exhibits as to which there are objections to admissibility not solely based on a lack of foundation shall likewise be marked appropriately, e.g., Plaintiffs' Exhibit 3 - For Identification or Defendants' Exhibit C - For Identification, and indexed in a third column entitled "Other Objection" on the offering party's index.

3.  Each separate index shall consist of the exhibit number or letter, a brief description of the exhibit, and the three columns outlined above, as demonstrated in the example below:

INDEX OF EXHIBITS

| EXHIBIT # | DESCRIPTION | ADMITTED IN EVIDENCE | OBJECTION FOUNDATION | OTHER OBJECTION |
|-----------|-------------|----------------------|----------------------|-----------------|

56

Two sets of the completed joint index and the separate indexes shall be delivered to the Courtroom Clerk with the two sets of binders.

The court has no objection to counsel using copies.  However, the copies must be legible.  If any document is offered into evidence that is partially illegible, the court may sua sponte exclude it from evidence.

### D.  Discovery Documents

By Thursday, October 25, 2012, each party shall file a list of all discovery documents the party intends to use at trial.  The list shall indicate whether each discovery document has previously been lodged with the Clerk.  If the discovery document has not been previously lodged, the party shall so lodge the document with the Courtroom Clerk by Thursday, October 25, 2012.

### E.  Motions In Limine Hearing and Briefing Schedule

The hearing for motions in limine will be held on October 15, 2012, at 1:30 p.m. in Courtroom 2.  In addition to addressing any filed motions in limine, at that time the court will also settle, to the extent possible, any other matter pertaining to the conduct of the trial.

Counsel are expected to be fully cognizant of the legal issues involved in the case by the date of the hearing for motions in limine.

By 4:00 p.m. on September 24, 2012, all motions in limine, with supporting points and authorities, shall be filed and served either personally or by facsimile upon opposing counsel.

By 4:00 p.m. on October 4, 2012, opposition to any motion in limine shall be filed and served either personally or by facsimile upon opposing counsel.  If a party does not oppose a motion in limine, that party shall file and serve in the same manner a Statement of Non-Opposition to that motion in limine.

By 4:00 p.m. on October 9, 2012, any reply to an opposition shall be filed and served either personally or by facsimile upon opposing counsel.  Because the court will need time

57

to prepare for the hearing on October 15, 2012, the court is not inclined to consider late reply briefs.

### F.  Morning Conferences During Trial

During the trial, it is the obligation of counsel to meet with the court each morning to advise the court and opposing counsel as to what documents are proposed to be put into evidence that have not previously been admitted by stipulation, court order, or otherwise ruled upon.  The court will rule on those documents, to the extent possible, prior to the commencement of trial each day out of the presence of the jury.  If the ruling depends upon the receipt of testimony, the court will rule as requested upon the receipt of such testimony.

The court shall consider any other legal matter at morning conferences as well. The court does not wish to recess the trial to hear legal argument outside of the presence of the jury, and proper preparation by counsel will eliminate the need for that result.

### G.  Order Of Witnesses

In order to make the trial operate efficiently and smoothly, each counsel has the continuing obligation to advise opposing counsel as to what witnesses he or she intends to call at each trial session.

### H.  Voir Dire

The parties shall file proposed voir dire questions, if any, by Thursday, October 25, 2012.

Additionally, in order to aid the court in the proper voir dire examination of the prospective jurors, counsel are directed to lodge with the court on the first morning of trial a list of the prospective witnesses they expect to call, omitting any witness listed in this Pretrial Order whom the party no longer intend to call.  This list shall contain the names of the each witness, and the business and/or home address of each witness.

### I.  Proposed Jury Instructions

The parties shall file proposed jury instructions by October 9, 2012, and shall email a copy of same in Word or WordPerfect format to awiorders@caed.uscourts.gov.

All proposed jury instructions shall be in duplicate.  One set shall indicate the party proposing the instruction, with each instruction numbered or lettered, shall cite supporting authority, and shall include the customary "Given, Given as Modified, or Refused," showing the court's action with regard to each instruction.  The other set shall be an exact copy of the first set, but shall be a "clean" copy that does not contain the identification of the offering party, supporting authority, or reference to the court's disposition of the proposed instruction.

The parties are ordered to confer immediately after the hearing on motions in limine on October 15, 2012, to determine which instructions they agree should be given.  As soon as possible thereafter, the parties shall submit a list of joint, unopposed instructions.  As to those instructions to which the parties dispute, the court will conduct its jury instruction conference during trial at a convenient time.

### J.  Proposed Verdict Form

Each party shall file a proposed verdict form by October 9, 2012.

### K.  Use Of Digital Video or Audio Recordings

Any party wishing to use a digital video or audio recording for any purpose during trial shall lodge a copy of the digital video or audio recording with the Courtroom Clerk by Thursday, October 25, 2012.  If a written transcript of audible words on the tape is available, the court requests that the transcript be lodged with the court, solely for the aid of the court.

### L.  Use of Digital Media

If counsel intends to use a laptop computer for presentation of evidence, they shall contact the courtroom deputy clerk at least one week prior to trial.  The courtroom deputy clerk will then arrange a time for counsel to bring the laptop to the courtroom, and meet with a representative of

the Information and Technology Department and receive a brief training session on how counsel's equipment interacts with the court's audio/visual equipment.  If counsel intends to use PowerPoint, the resolution should be set no higher than 1024 x 768 when preparing the presentation.

### M.  Agreed Summary Of The Case

The parties shall lodge with the Courtroom Clerk a joint agreed summary of the case, briefly outlining the positions of the parties by Thursday, October 25, 2012.  The summary will be read to the jury panel at the outset of the trial solely for the purposes of assisting in the jury selection process.  The contents of the summary shall not be deemed to be evidence or an admission or stipulation by a party as to any contested fact or issue.

## XX.   Rules of Conduct During Trial

### A.  General Rules

1. All participants in the trial shall conduct themselves in a civil manner.  There shall be no hostile interchanges between any of the participants.

2. All oral presentations shall be made from the podium, unless otherwise permitted by the court.

3. Sidebar conferences are discouraged.  Legal arguments or discussion of issues outside the presence of the jury should be done during recesses.

4. Counsel shall advise their respective clients and witnesses not to discuss any aspect of the case in the common areas of the courthouse accessible to the jurors, such as the lobby, the elevators, the hallways and the cafeteria.

### B.  Jury Selection

1. The court will conduct voir dire to be supplemented by any written questions submitted by counsel prior to trial and after the court has concluded its questioning of the jury panel.  In some circumstances, the court may allow brief direct questioning by

counsel.

**C.  Opening Statements**

    1.  Counsel may use visual aids in presenting the opening statement.  However, any proposed visual aids shall be shown to opposing counsel before opening statement.

**D.  Case in Chief**

    1.  Counsel shall have his/her witnesses readily available to testify so that there are no delays in the presentation of evidence to the trier of fact.

    2.  At the close of each trial day, counsel shall disclose his/her anticipated witnesses and order of presentation for the next day, so that any scheduling or evidentiary issues may be raised at that time.

**E.  Witnesses**

    1.  Before approaching a witness, counsel shall secure leave of court to approach the witness.

    2.  Before approaching a witness with a writing, counsel shall first show the writing to opposing counsel.

**F.  Exhibits**

    1.  All exhibits shall be marked and identified in accordance with the instructions in the Pretrial Order.

    2.  An exhibit shall not be published to the jury until it has been admitted into evidence and counsel has secured leave of court to publish the exhibit.

    3.  The court usually will conduct an on the record review of the exhibits that have been admitted in evidence at the conclusion of each party's case in chief and after each party has rested its entire case.

**G.  Objections**

    1.  No speaking objections or arguments are permitted in the presence of the jury.

61

Counsel shall state the specific legal ground(s) for the objection, and the court will rule based upon the ground(s) stated.  The court will permit counsel to argue the matter at the next recess.

2.  The court will not assume that any objection made also implies with it a motion to strike an answer that has been given.  Therefore, counsel who has made an objection, and who also wishes to have an answer stricken, shall also specifically move to strike the answer.

**H.  Closing Argument**

1.  Counsel may use visual aids in presenting the closing argument.  However, any proposed visual aids shall be shown to opposing counsel before closing argument.

XXI.  Objections to Pretrial Order

Any party may, within ten (10) calendar days after the date of service of this order, file and serve written objections to any of the provisions of this order.  Local Rule 16-283.  Such objection shall specify the requested corrections, additions or deletions.


FAILURE TO COMPLY WITH ALL PROVISIONS OF THIS ORDER MAY BE GROUNDS FOR THE IMPOSITION OF SANCTIONS, INCLUDING POSSIBLE DISMISSAL OF THIS ACTION OR ENTRY OF DEFAULT, ON ANY AND ALL COUNSEL AS WELL AS ON ANY PARTY WHO CAUSES NON-COMPLIANCE WITH THIS ORDER.


IT IS SO ORDERED.

Dated:     September 14, 2012     _____

CHIEF UNITED STATES DISTRICT JUDGE